IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

NEY LEASING CORPORATION,
INC.,

        Plaintiff,

vs.

CARGILL MEAT LOGISTICS
SOLUTIONS, INC., f/k/a WISPAK
TRANSPORT, INC.,

        Defendant.

No. C09-1051

RULING ON MOTION FOR
SUMMARY JUDGMENT

———————————

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    The Trailer Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    Collateral Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    D.    Performance Under the Lease Agreement . . . . . . . . . . . . . . . . 4

IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . 6

V.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    A.    Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        1.    Contract Claims (Counts II, III, and IV) . . . . . . . . . . . . . . 9
        2.    Equitable Claims (Counts I and V) . . . . . . . . . . . . . . . . . 13
        3.    Conversion (Count VI) . . . . . . . . . . . . . . . . . . . . . . . 14
    B.    Laches or Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    C.    Statute of Frauds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    D.    Inconsistent Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    E.    Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    F.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    G.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI.  ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 22) filed by the Defendant on July 9, 2010, the Resistance (docket number 28) filed by the Plaintiff on August 9, 2010, and the Reply (docket number 33) filed by the Defendant on August 18, 2010. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

# II. PROCEDURAL HISTORY

This case was commenced with the filing of a Complaint (docket number 1) by Plaintiff Ney Leasing Corporation, Inc. ("NLC") on November 20, 2009. Defendant Cargill Meat Logistics Solutions, Inc. ("Cargill") filed its answer on December 30, 2009. A non-jury trial is scheduled for November 8, 2010.[1]

On July 9, 2010, Cargill timely filed the instant motion for summary judgment. NLC filed its resistance on August 9, 2010. Cargill replied on August 18, 2010.

# III. RELEVANT FACTS

## A. The Parties

The plaintiff, Ney Leasing Corporation, Inc., is an Iowa corporation, with its principal place of business near Peosta, Iowa. NLC is wholly owned by Marvin Ney and his wife, Maria Ney. NLC was formed in 1989 for the purpose of owning semi-tractors and trailers.

At the same time they formed NLC, the Neys also established Ney Trucking Company, Inc. Ney Trucking leased equipment from NLC to transport food products. The Neys also established Top of the Class, Inc. to own the land and facility from which Ney Trucking and NLC operated.

The defendant, Cargill Meat Logistics Solutions, Inc., is a corporation with its principal place of business in Wichita, Kansas. Shortly after September 1, 2001, Cargill

---

[1] With the consent of both parties, this case was referred to the undersigned magistrate judge for final disposition, pursuant to 28 U.S.C. § 636(c). *See* docket number 10.

purchased Wispak Transport, Inc. ("Wispak") and assumed all its right, title, and interest in certain outstanding leases.

## B. The Trailer Lease

On July 27, 2000, NLC and Wispak entered into a "RENTAL CONTRACT," for the lease of refrigerated trailers owned by NLC. Wispak agreed to pay NLC $600 per month per trailer. The trailer lease originally included 32 refrigerated trailers. Approximately one month later, however, on August 25, 2000, the parties signed an addendum to the trailer lease, adding 21 additional refrigerated trailers, bringing the total number of trailers to 53. By its terms, the trailer lease was to continue for a period of three years.

Approximately one year later, in September 2001, the parties executed a second addendum to the trailer lease, adding five more trailers. Wispak agreed to pay $900 per month per trailer for the five additional trailers. The lease term for the five additional trailers was four years. All other terms and conditions of the lease remained the same.

On September 23, 2002, the parties executed a "FIRST AMENDMENT TO RENTAL CONTRACT," extending the terms of the lease agreement for an additional three months. The amendment specifically extends the original lease term to October 26, 2003. Regarding the five trailers leased on September 2, 2001, the amendment provided that the lease would continue for four years and three months from the date of that agreement. Thus, the lease term on the five additional trailers would expire on December 2, 2005.

## C. Collateral Agreements

At about the time that NLC and Wispak entered into the trailer lease, Marvin Ney was hired as General Manager of Wispak's trucking operation. After Wispak was acquired by Cargill, however, Ney's employment was terminated. On September 24, 2002 – one day after extending the lease agreement by three months – Ney and Wispak executed a "Separation Agreement and General Release."

The parties also entered into an agreement for the lease of 13 trucks. The manner in which the truck lease was terminated was hotly contested, and resulted in litigation. *See Ney Leasing Corporation, Inc. v. Cargill Meat Logistics Solutions, Inc.*, No. 2:08-cv-01041-JSS (N.D. Iowa).

As part of the agreements reached in 2000, Wispak also rented a facility owned by Top of the Class, Inc., one of the Neys' corporations. As part of the parties' agreement to terminate Ney's employment, the lease agreement with Top of the Class, Inc. was also terminated.

### D. Performance Under the Lease Agreement

The trailer lease was apparently performed without incident from July 2000 through the fall of 2003. That is, NLC sent monthly invoices for the amount due, and Cargill paid those amounts. When the lease period for the original 53 trailers expired on October 26, 2003, Cargill was current in its lease payments.

In September 2003, shortly before the extended lease for the original 53 trailers was scheduled to end, the parties began discussing the return of the trailers. The trailer lease provided that Cargill was required to return the vehicles to NLC's place of business at Peosta, Iowa, "in the same condition in which it was received by Lessee, and with 50 gallons of fuel in said vehicle." The lease specifically provided that "[t]ires and brakes shall be in good condition, with a minimum average of 50% of the original tread or brake pads."

On September 23, 2003, Jim Koeble, who was then vice-president of logistics for Cargill, sent an e-mail to Marvin Ney with a "trailer schedule attached." On October 7, 2003, Koeble sent Ney another e-mail, asking that he "[p]lease call so we can work a deal or coordinate a turn-in schedule."[2] On October 9, 2003, Koeble sent another e-mail to

---

[2] The e-mail further provides that "[t]he past due trailers are parked awaiting your direction." *See* Cargill's Appendix at 20. The attached trailer schedule lists the 53 original trailers, including the date delivered, ranging from July 2, 2000 to October 27, 2000. According to the schedule, the lease termination dates range from October 1, 2003 (continued...)

Ney, stating that he "tried a couple of times today to return your call but get a recording that subscriber is unavailable."

Also on October 9, 2003, Ney met with Donald Krueger of Thermo King Quad Cities, Inc. in Butler, Wisconsin, and inspected some of the trailers. Krueger returned to Milwaukee on November 24, 2003, together with NLC employee Bob Rodts, to conduct an additional inspection of the trailers. During the inspection, Krueger provided a repair estimate for each trailer, with the exception of trailer number 959, and this information was recorded by Rodts on Thermo King trailer inspection forms.

On December 9, 2003, Cargill returned two of the trailers, numbers 5004 and 5005. The two trailers were left in Dubuque, Iowa, and NLC arranged for an inspection by Mr. Krueger. Krueger estimated that trailer number 5005 required $7,562.52 in repairs and that trailer number 5004 required at least $3,900 in repairs. After being provided with the repair estimates, Jim Koeble of Cargill determined that the best way to conclude the trailer lease would be to exercise Cargill's right to purchase the trailers. The Rental Contract provided that "[s]aid rental may be terminated by purchase of all units by Lessee." Cargill then retrieved the two trailers which had previously been returned to NLC.

Cargill claims that an agreement was subsequently reached to purchase the 53 original trailers for the sum of $318,000, an amount equal to 10 monthly lease payments for the 53 trailers. NLC denies that any agreement was ever reached for the purchase of the 53 trailers by Cargill. Cargill concedes that a genuine issue of material fact exists on this issue. For purposes of the motion for summary judgment, the Court assumes that the parties had no such agreement.

---

[2](...continued)
to January 26, 2004 (three years and three months after the date of delivery). It is the Court's understanding, however, that both parties now assert that the lease period for all 53 trailers expired on October 26, 2003. *See* NLC's Statement of Material Facts in Resistance to Motion for Summary Judgment, ¶ 17.

Cargill brought its lease payments current through January 2004, and then made ten additional monthly payments, with the final payment deposited by NLC on November 23, 2004. Cargill claims that these payments were pursuant to their agreement to purchase the original 53 trailers. NLC denies such agreement, and argues that the payments simply represented additional monthly rent.

NLC refused to transfer title of the original 53 trailers to Cargill in November 2004. Cargill viewed NLC's refusal to transfer the titles as a breach of the trailer lease, and consequently withheld further rental payments for the five additional trailers, notwithstanding the fact that the five additional trailers remained in Cargill's possession and the lease pertaining to those trailers would not expire until December 2, 2005. NLC continued to send monthly invoices for all 58 trailers, but Cargill did not pay them.

On May 24, 2005, NLC sent a letter to Wispak, stating that the trailer lease payment is overdue, and indicating that legal action would be taken if full payment was not made within ten days. On December 8, 2006, NLC sent a second letter to Wispak, indicating that if no payment is made within 30 days, it will "turn it over to Collections." NLC continued to send monthly invoices to Cargill until approximately March 2007.

All 58 trailers remain in Cargill's possession. Apparently, many of the trailers have been modified from refrigerated trailers to dry storage. In its resistance to the motion for summary judgment, NLC asserts that on June 23, 2010 approximately 16 trailers were observed "to be in active use by Cargill in some capacity." NLC asserts that approximately 23 additional trailers "were not in active use, but appeared capable of possible use." Cargill concedes that 18 of the trailers can no longer be located.

### IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party.'" *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion, and must identify those portions of the record which it contends show a lack of a genuine issue of material fact. *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (same). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see, e.g., Baum v. Helget Gas Products, Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. DISCUSSION

NLC's complaint is brought in six counts:

- Count I – entitled "Implied In Law Contract/Quasi or Constructive Contract/Restitution/Unjust Enrichment" – pertains to the first 53 trailers leased by Cargill. NLC asserts that because the written lease agreement between the parties expired, and was not renewed in writing, "[t]he dispute between the parties as described herein does not arise out of an express

written or oral contract." NLC asserts that Cargill has retained possession and use of the 53 trailers, without paying rent since November 23, 2004, and is unjustly enriched thereby.

- Count II – entitled "Breach of Implied In Fact Contract" – NLC asserts alternatively that "an implied in fact contract existed between Cargill and Ney between October 26, 2003 and the present time regarding the 58 trailers."[3]

- Count III – entitled "Breach of Express Written Contract" – applies only to the last five trailers rented, and only for the period between November 23, 2004 and December 2, 2005. NLC claims that Cargill breached an express written contract during that time period by failing to make timely rental payments on the five trailers.

- Count IV – entitled "Breach of Implied In Fact Contract" – also applies to the last five trailers rented, but addresses the time period between December 2, 2005 and the present. NLC asserts that by retaining possession and use of the five trailers, and by failing to pay rent for the trailers, Cargill has breached an "implied in fact contract."

- Count V – entitled "Implied In Law Contract/Quasi or Constructive Contract/Restitution/Unjust Enrichment" – applies to the last five trailers rented, and for the time period from December 2, 2005 "through the present time and continuing indefinitely into the future." NLC asserts alternatively that Cargill is unjustly enriched by its continued possession and use of the trailers, without compensation to NLC.

- Count VI – entitled "Conversion" – applies to all 58 trailers. NLC asserts that Cargill has "intentionally misappropriated or taken dominion and control over the property owned by Ney," thereby giving rise to damages.

_____

[3] While Count II refers both to "the 58 trailers" and to "said 53 trailers," NLC clarifies in its brief that Count II is directed to the original 53 trailers.

8

Cargill asks that NLC's claims be summarily dismissed. Cargill argues that the claims are time-barred, violate the statute of frauds, or fail for other reasons.

### A. *Statute of Limitations*

First, Cargill argues that NLC's claims are barred by the statute of limitations found in Iowa Code section 554.13506(1) ("An action for default under a lease contract . . . must be commenced within four years after the cause of action accrued."). Cargill asserts that the alleged default occurred on November 23, 2004, when Cargill made its final payment to NLC. The instant action was not filed until November 20, 2009, nearly five years after Cargill's final payment. Accordingly, Cargill argues that the claims are time-barred.

In its resistance, NLC argues that the statute of limitations found in section 554.13506(1) does not apply to its claims of unjust enrichment (Counts I and V) or its claim for conversion (Count VI). NLC concedes that Counts II, III, and IV are contract claims and "acknowledges that Iowa Code section 554.13506(1) may be applied against these counts." NLC argues, however, that the statute does not act as a complete bar to its contract claims, but only bars those lease payments which accrued more than four years prior to the filing of its complaint. That is, NLC "agrees that, based upon Iowa Code section 554.13506(1), as its Complaint relates to contractual trailer rent due under Counts II, III, and IV before November 20, 2005, the statute of limitations does makes [*sic*] such rent unrecoverable." Thus, NLC asserts that it is entitled to recover rent accruing on all 58 trailers after November 20, 2005.

### 1. *Contract Claims (Counts II, III, and IV)*

Cargill's last payment to NLC was on November 23, 2004. Assuming the existence of a continuing trailer lease on the original 53 trailers, Cargill was in default when it failed to pay in December 2004. It is undisputed that Cargill owed rent on the five additional trailers in December 2004. Accordingly, Cargill's first alleged default occurred not later than December 2004. The four-year limitations period applicable to lease agreements began to run at that time. *Hamm v. Allied Mutual Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000) ("The general rule is that the contract statute of limitations commences upon the date

9

the contract is breached."). The action was not filed until November 20, 2009, nearly five years after Cargill's initial breach. The issue is whether NLC's failure to file its claim not later than December 2008 bars *all* of its claims under the lease agreement, or whether it bars *only* those claims which accrued more than four years prior to the filing of its complaint.

The only case which has cited Iowa Code section 554.13506 appears to be *Frontier Leasing Corp. v. James River Country Store*, 2006 WL 1409144 (Iowa App.), a 2006 opinion from the Iowa Court of Appeals. There, Frontier sued James River on an equipment lease. The district court dismissed the action, concluding that the statute of limitation on Frontier's claim had run, and the court of appeals affirmed. Pursuant to the parties' agreement, the lease became in default when one of the guarantors died. Frontier argued that the last lease payment was made in December 2000 and, therefore, James River was not in default until its nonpayment in January 2001. The court concluded that the guarantor's death in February 2000 "constituted a default under the lease, triggering the four-year limitation under Iowa Code section 554.13506 (1999), which then ran in February 2004." The court concluded that Frontier's action, filed on September 30, 2004, was time-barred.

> Under the applicable statute of limitations, a claim for default of a lease must be filed within four years of the accrual of the cause of action. Iowa Code § 554.13506(1). "A cause of action for default accrues when the act or omission on which the default or breach of warranty is based is or should have been discovered by the aggrieved party, or when the default occurs, whichever is later." *Id.* at § 554.13506(2). **The district court determined that the statute requires beginning the period of limitation from the first default, even in the event of multiple defaults.** Therefore, although the defendants eventually defaulted by nonpayment, the first default occurred with the death of the guarantor, George Roberts.

*Id.* at *1. (emphasis added) Accordingly, "the district court correctly dismissed Frontier's cause of action against the defendants as time-barred under section 554.13506." *Id.*

The Court in *Frontier Leasing* did not address, however, the issue presented here.[4] In arguing that the statute of limitations simply prohibits it from seeking damages which accrued more than four years prior to the filing of the complaint, NLC cites a similar case from North Carolina. In *Finova Capital Corp. v. Beach Pharmacy II, Ltd,* 623 S.E.2d 289 (N.C. App. 2005), the plaintiff brought an action for breach of a lease agreement. The Court first concluded that the four-year statute of limitations found in the Uniform Commercial Code, and adopted as a statute in North Carolina, was applicable to the lease.[5] Noting the "general rule" that the statute of limitations begins to run from the time each individual installment becomes due, the North Carolina Court of Appeals concluded that the "[p]laintiff is barred from recovering only those installment payments due prior to 14 October 1997, four years preceding the 13 October 2001 date on which it filed suit." *Id.* at 189.

NLC argues that the "general rule" referred to in *Finova Capital* is also found in Iowa law. For example, in *Bennett v. Tomlinson*, 221 N.W. 837 (Iowa 1928), an action was brought to recover judgment on a separate maintenance agreement. With little discussion on the subject, the Court stated that "[t]he statute of limitations began to run against each installment only from the time it fell due." *Id.* at 840. In *Hallett Const. Co. v. Meister*, 713 N.W.2d 225 (Iowa 2006), the court addressed the five-year statute of limitations applicable to an oral agreement for an at-will tenancy. The Iowa Supreme Court concluded that the district court erred in granting summary judgment on that count, noting that there was "no showing of undisputed facts establishing the alleged failure to pay rent and royalties occurred more than five years prior to suit being filed in 2003." *Id.* at 233. The Court added parenthetically: "Of course, any recovery under this count would necessarily be limited to sums payable in the five-year period preceding April 3, 2003 [the date the counterclaim was filed]." *Id.* In *Frenzel v. Frenzel*, 152 N.W.2d 157

_____

[4] Similarly, the issue was not addressed in the cases cited by Cargill in its reply.

[5] The North Carolina statute is identical to Iowa Code section 554.13506.

(Iowa 1967), the Court addressed the ten-year statute of limitations applicable to written contracts. No payments had been made on a promissory note which had been executed nearly 12 years earlier. The Court concluded that "[t]he installments accrued less than ten years prior to June 9, 1964 [when the action was filed] are not barred by any provision in the note." *Id.* at 160.

The Iowa Supreme Court reached similar conclusions in *State v. Stafford*, 584 N.W.2d 242, 246 (Iowa 1998) ("With respect to continuing periodic payments under a support order, a new twenty-year statute of limitations applies to each periodic payment from the time it is due.") (citing *Bennett*); *Boynton v. Salinger*, 126 N.W. 369, 371 (Iowa 1910) ("Where a note or bill is made payable in installments, the statute attaches, and begins to run on each installment as it becomes due, though the rule seems to be otherwise with reference to interest payable annually. This, also, is true of other contracts.") (citations omitted); and *Anderson v. Anderson*, 12 N.W.2d 571, 576 (Iowa 1944) ("We hold the statute commenced to run upon each annual installment when the same fell due."). It should be noted that this general rule is applicable even when, as in the instant action, the contract includes an acceleration clause. *See Bay Area Laundry v. Ferbar Corp.*, 522 U.S. 192, 208-09 (1997) ("This, again, is the rule that generally applies to installment obligations. If the creditor refrains from exercising the acceleration option, the limitations period on a particular payment runs from the date that payment comes due.").

Applied to the facts in the instant action, the Court concludes that the four-year statute of limitations found in Iowa Code section 554.13506 attached to each monthly lease payment as it allegedly became due. That is, "the cause of action accrued" as each monthly payment went unpaid. Accordingly, any lease payments which accrued more than four years prior to the filing of NLC's complaint are time-barred. Conversely, lease payments which allegedly accrued during the four years prior to the filing of the complaint are not barred by the statute of limitations. In other words, NLC cannot recover any lease payments which were allegedly due prior to November 20, 2005.

## 2.   Equitable Claims (Counts I and V)

Counts I and V of NLC's complaint assert claims based on unjust enrichment.[6] Count I pertains to the first 53 trailers leased by Wispak, while Count V refers to the additional 5 trailers. Although unjust enrichment is referred to as a quasi-contract theory, it is equitable in nature, not contractual. *State of Iowa v. Unisys Corp.*, 637 N.W.2d 142, 154 (Iowa 2001).

Cargill argues that the same statute of limitations which is applicable to NLC's contract claims, should also be applicable to its equitable claims. NLC argues, however, that the statute of limitations applicable to unwritten contracts also applies to claims for unjust enrichment.

In *Dolezal v. City of Cedar Rapids*, 326 N.W.2d 355 (Iowa 1982), the Iowa Supreme Court held:

> We hold plaintiff's unjust enrichment claim is outside the scope of section 613A.2 [governing tort liability of governmental subdivisions]. The claim is therefore subject to the five-year statute of limitations on unwritten contracts.

*Id.* at 360. *See also Glass v. Minnesota Protective Life Ins. Co.*, 314 N.W.2d 393 (Iowa 1982). Actions founded on unwritten contracts must be brought within five years. Iowa Code § 614.1(4).

Based on the Iowa Supreme Court's holding in *Dolezal*, the Court concludes that a five-year limitations period attaches to NLC's unjust enrichment claims. NLC's alleged cause of action accrued when Cargill failed to make any additional payments after November 23, 2004. The instant action was filed on November 20, 2009, just under five years later. Accordingly, the Court finds that NLC's unjust enrichment claims are not barred by the statute of limitations.

---

[6] "Restitution and unjust enrichment are modern designations for the older doctrine of quasi contracts or contracts implied in law, sometimes called constructive contracts." *Credit Bureau Enterprises, Inc. v. Pelo*, 608 N.W.2d 20, 25 (Iowa 2000).

### 3. *Conversion (Count VI)*

In Count VI of its Complaint, NLC asserts that Cargill has "intentionally misappropriated or taken dominion and control over the property owned by Ney," thereby giving rise to damages for conversion. Cargill first argues that a four-year statute of limitations applies to NLC's claim. Alternatively, Cargill argues that if a five-year limitations period applies, it began to accrue in January 2004 – more than five years prior to the filing of NLC's complaint.

Cargill apparently concedes that the five-year statute of limitations found in Iowa Code section 614.1(4) – pertaining to actions "brought for injuries to property" – generally applies to conversion actions. *See Barringer v. Bump*, 705 N.W.2d 507 (table), 2005 WL 2216953 (Iowa App.) at *1, n.4. Cargill seeks to avoid that result, however, by arguing that NLC's conversion claim "is nothing more than a disguised breach of lease claim."

Clearly, the trailers first came into Cargill's possession pursuant to a lease between NLC and Wispak. However, the manner in which the lease was terminated – or, indeed, whether the lease is on-going – is hotly contested. While NLC's claims arise from the same set of operative facts, it is not precluded from asserting alternative theories of recovery. *See* FED. R. CIV. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."). The proof required by NLC to establish its claims of an implied-in-fact contract (Counts II and IV) or its claim of breach of an express written contract (Count III) differ substantially from those facts which NLC must establish to prove wrongful conversion. NLC's lease claims require that it prove an agreement between the parties, either expressly (Count III), or by their actions (Counts II and IV). *Hitters, Inc. v. Harriott Bros., LLC*, 743 N.W.2d 870 (table), 2007 WL 3376789 (Iowa App.) at *5 ("A contract implied in fact is to every intent and purpose an agreement between the parties."). A claim for conversion does not require any agreement between the parties. Rather, the plaintiff asserts an ownership right inconsistent with that asserted by the defendant. *Matter of Estate of Bearbower*, 426 N.W.2d 392, 394, n.1 (Iowa 1988).

In short, they are very different claims. A five-year statute of limitations applies to Count VI.

Alternatively, Cargill argues that NLC's conversion claim, if any, accrued in February 2004, when Cargill's monthly payments were no longer intended to be rent, but rather installments on an oral purchase agreement for the first 53 trailers. As noted by both parties in their briefs, however, there are genuine issues of disputed fact regarding what was said by whom and when. The Court cannot rule, as a matter of law, regarding when the statute of limitations on NLC's conversion claim began to run.[7]

### B. Laches or Estoppel

Next, Cargill argues that even if the statute of limitations does not prevent NLC from filing its various claims, they are nonetheless time-barred by application of the doctrines of laches or equitable estoppel.

The Iowa Supreme Court recently summarized the doctrine of laches in *Garrett v. Huster*, 684 N.W.2d 250 (Iowa 2004), as follows:

> Laches is an equitable doctrine premised on unreasonable delay in asserting a right, which causes disadvantage or prejudice to another. The party asserting the defense has the burden to establish all the essential elements thereof by clear, convincing, and satisfactory evidence. Prejudice is an essential element of laches.

*Id.* at 255.

Unlike laches, the doctrine of estoppel by acquiescence requires no showing of detriment.

> Estoppel by acquiescence occurs when a person knows or ought to know of an entitlement to enforce a right and neglects to do so for such time as would imply an intention to waive or abandon the right.

*Id.*

---

[7] The Court notes parenthetically, however, that the "discovery rule" does not appear to apply in commercial conversion cases. *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476 (Iowa 1990).

More recently, the Iowa Court of Appeals identified the elements associated with estoppel by acquiescence:

> Estoppel by acquiescence is applicable when:
> (1) a party has full knowledge of his rights and material facts;
> (2) remains inactive for a considerable time; and
> (3) acts in a manner that leads the other party to believe the act now complained of has been approved.

*In re Marriage of Nielsen*, 759 N.W.2d 345, 349-50 (Iowa App. 2008) (citing *Markey v. Carney*, 705 N.W.2d 13, 21 (Iowa 2005)). The doctrine of estoppel by acquiescence "is, in reality, a waiver theory." *Westfield Ins. Cos. v. Economy Fire & Cas. Co.*, 623 N.W.2d 871, 880 (Iowa 2001).

The Court concludes that neither doctrine has application here. After Cargill stopped making monthly payments (even though the written lease on the five additional trailers was admittedly ongoing), NLC continued to send monthly invoices through March 2007, seeking trailer rent. NLC also sent collection letters to Cargill in May 2005 and December 2006. NLC responded to Cargill's audit department regarding the nature of the obligation. Marvin Ney of NLC and Jim Koeble of Cargill had discussions regarding the trailers. The record does not support a finding that NLC waived its claims for damages regarding the trailers, or otherwise led Cargill to reasonably believe that it would not seek damages regarding the trailers. Accordingly, NLC is not equitably estopped by acquiescence. Moreover, Cargill has failed to present clear, convincing, and satisfactory evidence that allowing NLC to pursue its claims at this time would result in prejudice. Therefore, the doctrine of laches is unavailing. In short, Cargill is not entitled to relief based on the doctrines of laches or equitable estoppel.

## C. Statute of Frauds

Cargill asserts that NLC's claims are also barred by the statute of frauds. Iowa Code section 554.13201(1)(a) provides that absent a writing, a lease contract is not enforceable unless "the total payments to be made under the lease contract . . . are less

than one thousand dollars." NLC responds initially by noting that Cargill failed to plead the statute of frauds as an affirmative defense. FEDERAL RULE OF CIVIL PROCEDURE 8(c)(1) requires the statute of frauds to be affirmatively pleaded. "Generally, failure to plead an affirmative defense results in a waiver of that defense." *First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 622 (8th Cir. 2007).

The purpose of Rule 8(c) is "to give the opposing party both notice of the affirmative defense and an opportunity to rebut it." *Id.* (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)). Accordingly, the Eighth Circuit has "eschewed a literal interpretation of the Rule that places form over substance, and instead have held that when an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply with Rule 8(c) is not fatal." *Id.* (internal citations omitted). The Court noted that it had previously cited favorably a Ninth Circuit opinion "allowing an affirmative defense to be raised for the first time in a summary judgment motion when there is no prejudice." *Id.* at n.5.

NLC does not claim prejudice here. The facts relating to the statute of frauds defense are well-known to the parties. NLC has had an opportunity to respond to Cargill's argument and, in fact, has done so. Accordingly, the Court will consider the statute of frauds defense on its merits. *See Archer Daniels Midland Co. v. Soucie*, 2009 WL 2365400 (D. Neb.) at *7 (finding that the statute of frauds defense would be considered at the summary judgment stage, notwithstanding the defendant's failure to plead the statute in its answer).

Next, NLC notes that Cargill's statute of frauds defense is applicable only to NLC's claims of implied-in-fact contracts (Counts II and IV). That is, Iowa Code section 554.13201 has no application to NLC's claims for unjust enrichment (Counts I and V), breach of an express written contract (Count III), and conversion (Count VI). Regarding its implied-in-fact contracts, NLC argues that they fall within an exception to the statute of frauds.

Iowa Code section 554.13201(4) provides that a lease contract which would otherwise fail to satisfy requirements of the statute of frauds, is nonetheless enforceable if the other party admits that a lease contract was made, or the "goods" which are the subject of the lease "have been received and accepted by the lessee." NLC asserts that Cargill has admitted the existence of a lease obligation for the five additional trailers through its correspondence and the setting of a financial reserve. In addition, NLC argues that Cargill's continued "acceptance" of the original 53 trailers – it should be recalled that NLC disputes Cargill's alleged purchase of the trailers – places this action within the exception found in section 554.13201(4)(c), and outside the general rule found in section 554.13201(1)(a).

The Court concludes that NLC's implied-in-fact contract claims are not barred by the statute of frauds. Cargill's actions suggest a recognition that the lease on the additional five trailers continued beyond December 2, 2005, when the express written lease expired. Cargill does not claim that it ever purchased the five additional trailers. It has continued to possess and use the trailers. Regarding the 53 original trailers, and assuming for purposes of the instant motion that no agreement was reached between the parties regarding the purchase of those trailers, the Court concludes that Cargill's continued possession of the trailers precludes summary dismissal of NLC's implied-in-fact lease claim.

### D. Inconsistent Claims

Next, Cargill argues that "[b]ecause NLC's implied contract claims are based on an alleged breach of the express Lease, they fail as a matter of law and should be dismissed." NLC concedes that "there cannot be both an express contract and an implied in law contract for the same thing existing at the same time." NLC argues that it is entitled to assert its claims in the alternative, however, with the Court addressing its unjust enrichment claims only if it finds that NLC is not entitled to recover on its claim of an implied-in-fact contract.

In *Irons v. Community State Bank*, 461 N.W.2d 849 (Iowa App. 1990), the Court described the relationship between express contracts, contracts implied in fact, and contracts implied in law.

> An implied in fact contract arises from the conduct of the parties, not merely from their relationship, and requires an expression of assent.

>> A contract may be express or implied. When the parties manifest their agreement by words, the contract is said to be express. When it is manifested by conduct, it is said to be implied in fact. Both are true contracts formed by a mutual manifestation of assent by the parties to the same terms of the contract. The differentiation arises from the method of proving the existence [of the contract].

> An implied in law or quasi-contract "is no contract at all, but a form of the remedy of restitution."

>> A quasi contractual obligation is one that is created by law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent. If this is true, it would be better not to use the word "contract" at all. Contracts are formed by expressions of assent; quasi contracts quite otherwise. The legal relations between contractors are dependent upon the interpretation of their expressions of assent; in quasi contract the relations of the parties are not dependent on such interpretations.

>> A contract implied in law is an obligation imposed by the law without regard to either party's expressions of assent either by words or acts. Such contracts are more properly called quasi or constructive contracts. Quasi contracts are imposed by law to prevent unjust enrichment: A person should not be allowed to enrich herself at the expense of

another. Therefore, the law will order the person benefited [*sic*] to pay just value to prevent unjust enrichment.

The North Dakota Supreme Court has outlined a set of elements to be proved on quasi contracts which we find helpful:

> 1.    An enrichment;
> 2.    An impoverishment;
> 3.    A connection between the enrichment and impoverishment;
> 4.    Absence of a justification for the enrichment and impoverishment; and
> 5.    An absence of a remedy provided by law.

*D.C. Trautman Co. v. Fargo Excavating Co.*, 380 N.W.2d 644, 645 (N.D. 1986).

There cannot be both an express contract and an implied in law contract for the same thing existing at the same time. The Iowa Supreme Court has "held many times that one who pleads an express oral contract cannot ordinarily recover upon an implied contract or quantum merit." However, where an express contract proves unenforceable, the law may imply a contract.

*Id.* at 855 (citations omitted).

Turning to the facts in the instant action, NLC claims that it is entitled to additional rent owed on the last five trailers rented pursuant to an express written contract which ended on December 2, 2005. NLC claims that additional rent is owed after that time on the last five trailers rented, pursuant to a contract which was implied in fact by the parties' actions. Similarly, NLC claims that it is entitled to additional rents owed on the initial 53 trailers pursuant to an implied-in-fact contract.[8] If the Court finds that no contract was implied in fact by the parties' conduct, however, then NLC claims that it is nonetheless entitled to recover under a theory of unjust enrichment (sometimes called an implied-in-law

_____

[8] NLC now concedes, however, that it cannot recover those rents which accrued prior to November 20, 2005 – four years prior to the filing of its complaint.

contract). Finally, NLC claims that it is entitled to recover for all 58 trailers on a theory of conversion.

FEDERAL RULE OF CIVIL PROCEDURE 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Furthermore, Rule 8(d)(3) provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." It is true that "an express contract and an implied contract cannot coexist with respect to the same subject matter; the express contract supersedes the implied contract with respect to its terms." *Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d 702, 712 (Iowa 1985) (citing *Maasdam v. Estate of Maasdam*, 24 N.W.2d 316, 321 (Iowa 1946)). For example, if NLC establishes an express contract for the last five trailers during the period ending December 2, 2005, then it cannot assert that different terms are established for those trailers during that time period by a contract implied in fact. NLC is not precluded, however, from asserting an implied-in-fact contract following the expiration of the express written contract. If NLC is unsuccessful in establishing an implied-in-fact contract, it is not precluded from asserting a claim for relief pursuant to a theory of unjust enrichment. In short, NLC is entitled to plead alternative, or even inconsistent, theories of recovery. *Garman v. Griffin*, 666 F.2d 1156, 1159 (8th Cir. 1981) (recognizing that inconsistent and contradictory allegations in the pleadings "has been recognized and indeed encouraged by Rule 8(e)(2)").

A party's entitlement to plead alternative theories of recovery should not be confused with the election-of-remedies rule.

> Designed to prevent double recovery for a single injury, the election-of-remedies rule applies when a party possesses two appropriate but inconsistent remedies and deliberately pursues one remedy to the other's exclusion. The rule does not prohibit assertion of multiple causes of action, nor does it preclude pursuit of consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction.

*Pennsylvania Nat'l. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 950-51 (8th Cir. 2004) (internal citations omitted).

### E. Conversion

Finally, Cargill asks that NLC's conversion claim (Count VI) be summarily dismissed. Cargill argues that NLC's failure to demand the return of the trailers is fatal to its claim and, in any event, Cargill's retention of the trailers was in good faith.

"A conversion occurs when a person or entity exercises wrongful control or dominion over the property of another in denial of or inconsistent with the other's possessory right to the property." *Larson v. Great West Cas. Co.*, 482 N.W.2d 170-173 (Iowa App. 1992). "The interference must be so serious that the actor may justly be required to pay the other the full value of the property." *Kendall/Hunt Publishing Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988). In determining the "seriousness of the interference," Iowa has adopted a list of factors from the Restatement (second) of Torts section 222A:

> (a)    the extent and duration of the actor's exercise of dominion or control;
> (b)    the actor's intent to assert a right in fact inconsistent with the other's right of control;
> (c)    the actor's good faith;
> (d)    the extent and duration of the resulting interference with the other's right of control;
> (e)    the harm done to the chattel;
> (f)    the inconvenience and expense caused to the other.

*Id.*

Generally, to recover for conversion of property, the plaintiff must show that a demand was made for the return of the property, or that an "actual conversion" occurred. *State v. Williams*, 179 N.W.2d 756, 759 (Iowa 1970) ("The rule is too well established to require citation of authorities to verify it, that conversion may be shown either by direct proof of the fact of conversion, or by proof of a demand and refusal."); *Halferty v. Hawkeye Dodge, Inc.*, 158 N.W.2d 750, 753 (Iowa 1968) (noting that Iowa authorities suggest that no demand for return of the property is required "where there has been an

actual conversion"). In *Hart v. Wood*, 209 N.W. 430 (Iowa 1926), an action was brought for the return of an automobile. The defendants "urged that the plaintiff's case should have been dismissed for want of demand." *Id.* at 432. The Iowa Supreme Court rejected the defendants' argument.

> The purpose of a demand is to furnish the opportunity to one rightfully in possession, to surrender his possession to the rightful claimant without being subjected to suit or the costs thereof. Where the defendant asserts his absolute right to maintain possession as against the plaintiff, regardless of demand, we see little occasion for abating a suit for want of demand. When the defendant discloses such to be his attitude, he discloses also that a demand upon him would have been a useless formality.

*Id.*

NLC concedes that it did not make a formal demand for the return of its trailers, but argues that such a demand would have been a "useless formality." Cargill asserts that an agreement was reached to purchase the original 53 trailers, payment was made in full pursuant to that agreement, and demand was made for NLC to produce the titles to those trailers. Cargill has failed to maintain the trailers, and has apparently converted them from their original purpose of refrigerated trailers to use as storage or for short hauls. Eighteen of the trailers can no longer be located. NLC argues that these facts establish "an actual conversion" of the trailers, thereby making any demand for their return fruitless. At the least, a genuine issue of material fact exists regarding whether NLC was required to make a demand for the trailers' return under these circumstances.

Cargill also argues that NLC is not entitled to recover on its conversion claim because Cargill acted in good faith in retaining possession of the trailers. "Good faith by the defendant is a factor to consider in determining whether the interference amounts to conversion." *Condon Auto Sales & Service, Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999). *See also McCray v. Carstensen*, 492 N.W.2d 444, 446 (Iowa App. 1992) ("The good faith of defendants is another consideration in assessing the seriousness of the interference."). Cargill's alleged good faith in retaining possession of the original

53 trailers and the additional 5 trailers is a factor which the Court must consider in determining whether NLC has proved wrongful conversion. However, this factor alone will not support summary dismissal of the claim.

## F. Damages

In its brief, Cargill asks that if the Court determines that NLC's conversion claim should proceed to trial, that the Court also advise the parties regarding "the proper measure of calculating damages for a conversion claim under Iowa law." The Court declines the opportunity to opine regarding damages prior to hearing the evidence presented at the time of trial. Similarly, the Court will not address at this time NLC's claim for attorney fees.

## G. Summary

In summary, the Court concludes the following:

1.    The statute of limitations does not bar NLC's claims for breach of an express contract (Count III) or implied-in-fact contracts (Counts II and IV). However, NLC cannot recover any lease payments which were allegedly due prior to November 20, 2005 (four years prior to the filing of the complaint).

2.    The statute of limitations does not bar NLC's unjust enrichment claims (Counts I and V).

3.    The statute of limitations does not bar NLC's conversion claim (Count VI).

4.    The doctrine of laches does not bar NLC from pursuing its claims.

5.    The doctrine of equitable estoppel does not bar NLC from pursuing its claims.

6.    The statute of frauds does not bar NLC from pursuing its claims of implied-in-fact contracts (Counts II and IV).

7.    The statute of frauds has no application to NLC's claims for unjust enrichment (Counts I and V), breach of an express written contract (Count III), and conversion (Count VI).

8.    NLC is entitled to pursue alternative theories of recovery.

9. Cargill is not entitled to summary dismissal of NLC's conversion claim (Count VI).

### VI. ORDER

IT IS THEREFORE ORDERED that Cargill's Motion for Summary Judgment (docket number 22) is hereby **DENIED**.

DATED this 6th day of October, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA